HOWARD HOLDERNESS (SBN 169814)
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: 415.442.1000
Facsimile: 415.442.1001
E-mail: hholderness@morganlewis.com

KRISTOFOR T. HENNING (PAB 85047)
(*Pro Hac Vice*)
FRANCO A. CORRADO (PAB 91436)
(*Pro Hac Vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: 215.963.5000
Facsimile: 215.963.5001
E-mail: khenning@morganlewis.com
E-mail: fcorrado@morganlewis.com

Attorneys for Defendant
HEWLETT-PACKARD COMPANY

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

NATHAN NYGREN, STEPHEN
SHIFFLETTE and AMY FROMKIN, on
behalf of themselves and all others
similarly situated,

        Plaintiffs,

    v.

HEWLETT-PACKARD COMPANY, a
Delaware corporation,

        Defendant.

Case No. 07-CV-05793 (JW)

**HEWLETT-PACKARD COMPANY'S
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS
OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

Hearing:

Date:      May 24, 2010
Time:     9:00 a.m.
Before:   Honorable James Ware
Courtroom: No. 8, 4th Floor
          San Jose

Action Filed:    November 14, 2007
Trial:         October 5, 2010

1

## TABLE OF CONTENTS

2   INTRODUCTION ................................................................................................ 1

3   FACTS ............................................................................................................... 4

4
            A.    The Putative Class Computers And HP's Limited Warranty ................................. 4
5
6           B.    The Atlantis And Apollo Notebooks Passed Strenuous Industry
                  Standard Testing ...................................................................................... 5

7           C.    HP Reacted Quickly To Address Any Issues Its Customers Experienced ............. 5

8
            D.    HP Provided Repairs Beyond What It Was Required To Provide ......................... 6
9
            E.    Plaintiffs And Their Varying Experiences ............................................................. 8
10
11  ARGUMENT ..................................................................................................... 11

12          A.    Plaintiffs Must Prove (Not Merely Allege) The Class
                  Certification Requirements ..................................................................... 11
13
14          B.    Plaintiffs Have Failed To Prove That Common Factual Issues Predominate ....... 11

15                1.    Individualized Examinations Are Necessary To Determine
                        Whether And When Any Putative Class Member Experienced
16                      A Wireless Failure ............................................................................. 12

17                2.    Individual Examinations Are Necessary To Determine
                        Whether Putative Class Members Received A Repair That
18                      Made Their Computers Operable For The Remainder Of
19                      Their Warranty Period ....................................................................... 14

20                3.    Individual Analysis Is Necessary To Determine Whether Each
                        Putative Class Member Received A Repair Under The Program ............. 15
21
22                4.    Plaintiffs' Purported Economic Expert Cannot Establish
                        Common Economic Injury Or An Appropriate Aggregate
23                      Restitution Calculation ....................................................................... 16

24                5.    HP's Pre-Sale Knowledge Is Not Subject To Common Proof .................. 17

25                6.    Plaintiffs Cannot Ignore Absent Class Members .................................. 18

26          C.    Common Legal Questions Do Not Predominate Because The Court
                  Must Apply The Law Of Each Putative Class Member's Home State ................. 19
27

28

D.    This Class Action Is Not A Superior Method Of Adjudication
And Plaintiffs Are Neither Typical Nor Adequate Class Representatives ........... 24

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Agostino v. Quest Diagnostics*, 256 F.R.D. 437 (D.N.J. 2009) ............................................... 20, 21

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ............................................................ 11, 12

*Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392
    (E.D. Pa. 2006).......................................................................................................... 23

*In re Baycol Prods. Litig.*, 218 F.R.D. 197 (D. Minn. 2003)........................................... 24

*Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009)................................................... 19

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*,
    288 F.3d 1012 (7th Cir. 2002)............................................................... 20, 23, 24

*Brothers v. Hewlett-Packard Co.*, No. C-06-02254,
    2006 U.S. Dist. LEXIS 82027 (N.D. Cal. Oct. 31, 2006)............................... 14, 17

*Burdick v. Union Sec. Ins. Co.*, No. 07-4028, 2009 U.S. Dist. LEXIS 121768
    (C.D. Cal. Dec. 9, 2009) ................................................................................. 19

*Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998) ............................................. 23

*Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008) ..................... 12, 13

*Cohen v. DirecTV*, 178 Cal. App. 4th 966 (2d Dist. 2009)........................................ 18

*Colgan v. Leatherman Tool Group*, 135 Cal. App. 4th 663 (2d Dist. 2006) .............................. 17

*Cummings v. Connell*, 402 F.3d 936 (9th Cir. 2005) ......................................... 11, 18

*Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (2d Dist. 2006) ............................ 12

*Fink v. Ricoh Corp.*, 839 A.2d 942 (N.J. Super. Ct. Law Div. 2003).......................... 20

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332
    (D.N.J. 1997)............................................................................................... 21

*Gable v. Land Rover N. Am.*, No. 07-376, 2008 U.S. Dist. LEXIS 82996
    (C.D. Cal. Sept. 29, 2008)............................................................................ 13

*Gartin v. S&M NuTec LLC*, 245 F.R.D. 429 (C.D. Cal. 2007)................................... 20

*In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305
    (S.D. Ill. 2007) ............................................................................................ 23

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982)......................................... 11

*In re HP Inkjet Printer Litig.*, No. C 05-3580, 2008 U.S. Dist. LEXIS 56979
    (N.D. Cal. July 25, 2008)............................................................................ 20

*Hall v. Time, Inc.*, 158 Cal. App. 4th 847 (4th Dist. 2008)...................................... 15

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)................................................. 11, 25

*Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364 (D.N.J. 2004) ...................................................... 23

*Hoey v. Sony Elecs.*, 515 F. Supp. 2d 1099 (N.D. Cal. 2007)................................................... 17

*In re Hotel Telephone Charges*, MDL No. 89, 500 F.2d 86 (9th Cir. 1974) ......................... 16, 18

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ..................................... 11

*In re IPO Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) ..................................................................... 11

*Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*,
929 A.2d 1076 (N.J. 2007).................................................................................................... 24

*Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830
(4th Dist. 2009)..................................................................................................................... 18

*Kandel v. Brother Int'l Corp.*, No. 08-1040, 2010 U.S. Dist. LEXIS 23493
(C.D. Cal. Feb. 1, 2010) ....................................................................................................... 25

*Klein v. Earth Elements, Inc.*, 59 Cal. App. 4th 965 (1st Dist. 1997)......................................... 17

*Laster v. T-Mobile USA*, No. 05-1167, 2009 U.S. Dist. LEXIS 116228
(S.D. Cal. Dec. 14, 2009) ..................................................................................................... 19

*Long v. Hewlett-Packard Co.*, No. C 06-02816, 2007 U.S. Dist. LEXIS 79262
(N.D. Cal. July 27, 2007), *aff'd*, 316 F. App'x 585 (9th Cir. 2009) ............................ 5, 14, 17

*Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206 (E.D. Pa. 2000) ....................................................... 23

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008)............................................ 16, 18

*Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221 (S.D. Fla. 2002) ................................ 24

*Morgan v. Harmonix Music Sys.*, No. C 08-5211, 2009 U.S. Dist. LEXIS 57528
(N.D. Cal. July 7, 2009).......................................................................................................... 17

*Oestreicher v. Alienware Corp.*, 322 F. App'x 489 (9th Cir. 2009)....................................... 12, 17

*Oresman v. G.D. Searle & Co.*, 321 F. Supp. 449 (D.R.I. 1971) ............................................... 23

*Osborne v. Subaru of Am.*, 198 Cal. App. 3d 646 (3d Dist. 1988) ............................................ 22

*Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583 (4th Dist. 2008) .......................................... 15

*Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622 (2d Dist. 2010) ........................................ 18

*In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61
(D. Mass. 2005)...................................................................................................................... 24

*In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555 (E.D. Ark. 2005) ................................... 20, 21

*In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004) ................................................ 23

iv

*In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597 (S.D.N.Y. 2005) ..................................... 23

*In re St. Jude Med., Inc.*, 425 F.3d 1116 (8th Cir. 2005) ............................................................ 21

*Sanders v. Apple Inc.*, No. C 08-1713, 2009 U.S. Dist. LEXIS 6676
  (N.D. Cal. Jan. 21, 2009) ........................................................................................... 12, 19

*Seely v. White Motor Co.*, 63 Cal. 2d 9 (1965) ............................................................................ 17

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, No. 08-1008,
  2010 WL 1222272 (U.S. Mar. 31, 2010) ........................................................................ 4, 18

*Spence v. Glock, GES.m.b.H.*, 227 F.3d 308 (5th Cir. 2000) ....................................................... 23

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ............................................ 23

*Szabo v. Bridgeport Machs.*, 249 F.3d 672 (7th Cir. 2001) ......................................................... 12

*Terry v. Pullman Trailmobile*, 376 S.E.2d 47 (N.C. Ct. App. 1989) .......................................... 23

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ............................................................................. 3

*Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349 (Tex. App. 2003) ............................................... 20

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ................................................ 11

*In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450 (E.D. La. 2006) ............................................... 23

*Zinser v. Accufix Research Inst.*, 253 F.3d 1180 (9th Cir.),
  *amended by* 273 F.3d 1266 (9th Cir. 2001) ...................................................... 11, 12, 20, 24

## STATUTES AND RULES

28 U.S.C. § 2072(b) ...................................................................................................................... 18

Fed. R. Civ. P. 23 .............................................................................................................. 3, 11, 18

Cal. Bus. & Prof. Code § 17204 .................................................................................................. 12

1

## **INTRODUCTION**

2

Plaintiffs Nathan Nygren, Stephen Shifflette and Amy Fromkin ("Plaintiffs") bought

3    Hewlett-Packard Co. ("HP") notebook computers (code-named Atlantis and Apollo within HP)

4    that came with a one-year limited warranty (the "Limited Warranty").  Plaintiffs allege that their

5    computers contain a "heat-cycling" defect that, after a period of time, prevented them from

6    wirelessly accessing the internet.  *See* Pls.' Second Amended Complaint ("SAC") ¶¶ 1, 20, 25,

7    27, 34, 54, 63.  The component that Plaintiffs allege was the cause of their wireless failures was

8    not manufactured by HP, but rather by Nvidia Corporation.  *See* Pls.' Notice of Motion and

9    Motion for Class Certification ("Pls.' Br.") at 2:1.  Nvidia is the subject of a consolidated

10   nationwide class action in this Court alleging that it sold defective chips "to its original equipment

11   manufacturers . . . such as Hewlett-Packard, which were then included in [their] computers . . . ."[1]

12   Although Plaintiffs appear to be putative class members in the Nvidia litigation – and they claim

13   that Nvidia's chip is the alleged cause of  their wireless failures – they filed this action against

14   HP.

15

Plaintiffs' SAC asserted six causes of action, ranging from breach of warranty to

16   violations of the California Consumer Legal Remedies Act and all three prongs of the Unfair

17   Competition Law ("UCL").  On May 28, 2009, this Court granted HP's motion to dismiss all of

18   Plaintiffs' warranty and misrepresentation/omission based claims, leaving only a single remaining

19   cause of action:  that HP violated the "unfair" prong of the UCL by knowingly selling computers

20   with defective wireless functionality and failing to provide an adequate repair.  Ex. 2 at 11:23 –

21   12:2;[2] Pls.' Br. at 1:24-26.

22

Where, as here, a manufacturer sells a product with a Limited Warranty that provides for

23   "repair or replacement" of defective parts during the warranty period, there is no dispute as to the

24   scope of the manufacturer's legal obligation to its customers – the manufacturer is obligated to

25   repair or replace the defective parts such that the product operates properly for the remainder of

26

---

27   [1]     *See, e.g.,* Declaration of Kristofor T. Henning, Ex. 1 at 1.  Future references to "Ex. __" are to the exhibits attached to the Declaration of Kristofor T. Henning.

28   [2]     *See id.* at 5:8-11; 9:18-19; *see also id.* 10:3-5; *see also* Ex. 3 at 2:9-15.

the warranty term. This obligation does not require that the manufacturer provide a perfect product at the time of sale. Nor does it require that the manufacturer repair the customer's product *ad infinitum*. This point of law is unassailable; it forms the basis not only of this Court's May 28, 2009 Order dismissing all but one of Plaintiffs' causes of action, but of numerous similar decisions by this Court, other courts in this Circuit, and California state appellate courts.

Did HP satisfy that legal obligation to Plaintiffs? Although the ultimate answer to this question requires a merits adjudication best left for HP's upcoming motion for summary judgment on Plaintiffs' individual claims, the class certification evidence makes clear that it would be *impossible* for Plaintiffs to meet their burden of establishing on a classwide basis that HP acted "unfairly" to every member of the putative class. Not only did HP repair computers during the one-year term of the putative class's Limited Warranty, HP went above and beyond that obligation and created a Limited Warranty Enhancement Program (the "Program") that allowed customers to obtain a free repair of their motherboard for an *additional year*. In total, HP provided approximately 300,000 free motherboard replacements for Atlantis and Apollo units.

Notwithstanding the Program (disclosed through HP's website and over 1 million e-mails) and HP's decision to provide its customers with *more* than they bargained for, Plaintiffs (all of whom chose to forego a repair under the Program) seek certification of a nationwide class of computer purchasers under the theory that HP acted unfairly on a classwide basis by: (1) selling computers that worked precisely as warranted for many customers; and (2) repairing those computers that did fail *for an extra year*. Not surprisingly, Plaintiffs have no answer for how they intend to prove that HP, by voluntarily implementing a free repair program for an additional year at no cost to the putative class, acted unfairly to *any* class members – let alone *all* class members.

Needless to say, numerous individual fact issues predominate over any common issues, starting with the need to determine whether each putative class member even experienced a wireless failure. Given the nature of the putative class notebooks, they were often used in one place with a wired internet connection or otherwise connected to the internet without use of their internal wireless capability. Those users suffered no injury and can be identified only through purchaser by purchaser examinations. In addition, more than three years after HP first shipped a

1  putative class computer, only approximately 17% of those computers received a free motherboard

2  replacement.[3]  That disparity precludes any conclusion of a common wireless failure among

3  putative class members.

4     Even for purchasers who claim to have experienced a wireless failure, individual

5  examinations are required to determine when.  Putative class members like Plaintiff Shifflette

6  who did not experience a wireless failure until after the expiration of their Limited Warranty

7  period cannot sustain an "unfair" UCL claim against HP.  There is no way to determine when any

8  such failure occurred, however, without examining each putative class member's circumstances.

9     Individual examinations are also required to determine whether each putative class

10  member received a repair.  Putative class members who received a repair that rendered their

11  computer operable for their Limited Warranty period have not suffered an injury that could

12  support an "unfair" claim (even if their computer later malfunctioned) – and they can only be

13  identified through purchaser by purchaser examinations.  Similarly, not every putative class

14  member took advantage of the free repair HP made available under the Program.  Plaintiffs all

15  declined for instance (in two cases because they preferred litigation).  Thus, there is no way to

16  determine from common proof which putative class members received a Program repair and,

17  therefore, suffered no injury.  Not only that, but HP offered more than one wireless repair and the

18  repairs it provided varied over time and depending on the possible cause of a particular

19  purchaser's wireless failure.  As a result, there is no common proof from which the Court could

20  evaluate each putative class member's repair (if any).

21     Plaintiffs have not presented any feasible plan to resolve these and other individual issues

22  from a single body of evidence for every purchaser – because they cannot.  Instead, Plaintiffs

23  have asked the Court to ignore absent putative class members' circumstances under *In re Tobacco*

24  *II Cases*, 46 Cal. 4th 298 (2009), where the California Supreme Court held that absent class

25  members asserting UCL claims in California state court need not satisfy the UCL's injury and

26  causation requirements. *Tobacco II,* 46 Cal. 4th at 324.  In *federal* court, however, Rule  23, the

27

28  [3]     Free repairs include at least Limited Warranty repairs and repairs under the Program.

1  Rules Enabling Act and Article III of the Constitution require every putative class member to

2  prove the same elements of a UCL claim.  A class action in federal court can join claims of

3  multiple individuals, but it cannot change the elements of those claims depending on a claimant's

4  status as a named or absent class member.  The Supreme Court reaffirmed these principles only

5  days ago.  *See, e.g., Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, No. 08-1008, 2010

6  WL 1222272 (U.S. Mar. 31, 2010).

7        Common legal issues also do not predominate because the Court must apply the law of

8  each putative class member's home state to his/her claim (not California law uniformly).  State

9  consumer protection statutes differ in important ways and putative class members' home states

10  have the greatest interest in their claims.  That is where they bought and used their computers and

11  likely experienced any alleged wireless malfunction.  Plaintiffs, for example, are all non-

12  California residents who bought their computers and experienced alleged wireless failures outside

13  of California.  Not only that, but the putative class computers were not designed in California and,

14  therefore, California has little (if any) interest in non-California residents' claims.  HP's notebook

15  group is located in Houston, Texas and the design and pre-launch testing of the putative class

16  computers occurred outside of California (and in some cases outside of the United States).

17  Accordingly, the Court should follow the weight of authority and deny Plaintiffs' motion because

18  the application of 50 states' laws makes management of this case as a class action impossible.

19  **FACTS**

20  **A.    The Putative Class Computers And HP's Limited Warranty.**

21        Plaintiffs' putative nationwide class includes all persons and entities in the United States

22  who purchased a dv6000, V6000 or dv9000 model series HP notebook computer after August 1,

23  2006.  Pls.' Br. at 3.  Plaintiffs refer to those computers by their internal HP code names –

24  Atlantis and Apollo.  *Id.* at 4.  In truth, only some (but not all) dv9000 notebooks are Apollo

25  computers and some (but not all) dv6000 and V6000 notebooks are Atlantis computers.  *See*

26  Declaration of Richard Hunt Hodge ("Hodge Dec.") ¶ 4.  Plaintiffs have clearly limited their

27  claims to Atlantis and Apollo computers.[4]  Pls.' Br. at 4.[5]  Plaintiffs' notebooks came with HP's

28  _____

[4]    HP shipped a total of approximately 1,787,578 Atlantis and Apollo units within the

one-year "repair or replace" Limited Warranty. "HP does not warrant that the operation of [its] product[s] will be uninterrupted or error-free," but instead provides for necessary repairs during the warranty period. *See* Ex. 4 at 3; *Long v. Hewlett-Packard Co.*, No. C 06-02816, 2007 U.S. Dist. LEXIS 79262, at *12 (N.D. Cal. July 27, 2007) (explaining that HP "does not warrant that its products will operate uninterruptedly or free of errors – simply that HP will repair or replace any product to the warranted condition within a reasonable time"), *aff'd*, 316 F. App'x 585 (9th Cir. 2009).

**B.      The Atlantis And Apollo Notebooks Passed Strenuous Industry Standard Testing.**

Before their launch to the public, HP's Atlantis and Apollo units underwent a battery of industry standard and HP proprietary development and regression testing, including a series of communications tests to verify wireless functionality and industry standard thermal cycling and stress protocols. Hodge Dec. ¶¶ 8-18; 20-23. Those tests included some that stressed the units beyond normal use – and the Atlantis and Apollo units passed all of them. *Id.* ¶¶ 20-23. In total, HP tested approximately 1000 prototype units for more than 100,000 aggregate test hours before the Atlantis and Apollo units were cleared for launch. *Id.* ¶ 24.

**C.      HP Reacted Quickly To Address Any Issues Its Customers Experienced.**

There are multiple causes of alleged wireless failures (including for failures characterized by the computer's inability to recognize the wireless device in its device manager – a symptom Plaintiffs have claimed), including many that have nothing to do with "heat-cycling." *See* Expert Report of Charles J. Neuhauser ("Neu. Rep.") at 2, 10, 13; Hodge Dec. ¶¶ 34-35. To assist its customers, HP identified and quickly addressed three possible causes of wireless failures in different ways following the launch of the Atlantis and Apollo computers. Hodge Dec. ¶¶ 36-57.

In late October/early-November 2006, HP determined that a limited number of chips manufactured by Nvidia affecting wireless connection had been damaged as a result of excessive pressure applied during Nvidia's validation testing. *Id.* ¶ 36. The excess pressure caused cracking that could in some instances affect wireless connectivity. *Id.* Once it learned of this

---

United States between July 2006 and January 2009.

[5]      Even if Plaintiffs amended their class definition to include only Atlantis and Apollo units, class certification is improper for the reasons set forth herein.

issue, HP and its partners took prompt steps to ensure that affected chips were not used in its computers. *Id.* ¶¶ 37-44.

In September 2007, HP determined that a signal generated by the same chip in some Atlantis and Apollo notebooks was sometimes too weak to communicate with the notebook's wireless radio card, thereby interrupting wireless connection. *Id.* ¶ 45. By the end of that month, HP had qualified a corrective BIOS update (BIOS F.3A) which increased the signal amplitude strength and resolved wireless failures in 8 out of 10 tested units. *Id.* ¶¶ 46-47. HP notified customers of its BIOS update through, *inter alia*, posts to a forum on its website. *See* Declaration of Norma Nussbaumer ("Nuss. Dec.") ¶¶ 5-6.

By early November 2007, HP determined that some Atlantis and Apollo notebooks could under certain circumstances experience wireless failures caused by cracks to relevant chips resulting from specific repeated temperature cycling inside the computer. Hodge Dec. ¶¶ 49-58. HP again reacted quickly with a BIOS update (BIOS F.3D) that greatly reduces or eliminates the probability of future heat cycling chip cracks by eliminating cycling through the relevant range. *Id.* ¶¶ 51-52, 57. HP later qualified and tested the BIOS update and confirmed its effectiveness for purchasers who had not experienced a chip crack. *Id.* ¶ 57; Neu. Rep. at 12-15. HP notified customers beginning on December 3, 2007 of its BIOS F.3D update through various means, including a direct e-mail campaign and postings on its website. Nuss. Dec. ¶¶ 19-26. BIOS F.3D has been downloaded from HP's website nearly 380,000 times. *Id.* ¶ 40. For customers who may have already experienced a chip crack, HP implemented the Program described below. *Id.* ¶ 9.

## D.    HP Provided Repairs Beyond What It Was Required To Provide.

In November 2007, HP expanded the Program for certain Atlantis and Apollo notebooks to, *inter alia*, provide for a repair to customers who experienced certain symptoms, including wireless failures.[6] *Id.*[7] By March 2008, the Program included all Atlantis and Apollo models. *Id.*

---

[6]    In August or September 2006, HP discovered and corrected a circuitry issue with certain Atlantis and Apollo units, known internally as PQ1. Hodge Dec. ¶¶ 64-65. As Plaintiffs' purported expert acknowledged, PQ1 has no bearing on wireless functionality. *See* Report of Eric Langberg ("Lang. Rep.") ¶ 23.

[7]    The Program does not extend the term of HP's Limited Warranty. As HP explained, it does not affect the terms of that Limited Warranty. Nuss. Dec. ¶¶ 8, 11 (Exhibits A & B). The Program is an additional level of repair beyond HP's Limited Warranty.

¶ 11.   HP provided extensive notice of the Program, including descriptions on its website (www.hp.com).[8]  *Id*. ¶¶ 8, 15.  HP also: (1) disclosed the program on a forum on its website where customers discussed wireless connectivity; (2) sent over 1 million total e-mails to customers who had registered their computers with HP (some of whom received more than one); and (3) used "HP Update" and "HP Instant Support" to disclose the program.  *Id*. ¶¶ 16-28; 33. Since November 2007, the Program description posted to www.hp.com registered over 4.8 million "hits."  *Id.* ¶ 40.

The Program provides for a free wireless repair (usually a motherboard replacement) and free shipping for twenty-four months after a customer's purchase.  *Id.* ¶¶ 9, 13-14.  The free Program repair comes with its own 90 day warranty.  *Id.* ¶ 13.  If a customer who receives a Program repair experiences a covered wireless symptom again within the eligible Program period, HP will provide another free repair.  *Id.*

All repairs under the Program have not been exactly the same; they changed over time as HP acquired more information.  Starting December 3, 2007, all Atlantis and Apollo replacement motherboards were pre-loaded with BIOS F.3D.  Hodge Dec. ¶ 60.  Starting December 7, 2007, spare Atlantis and Apollo motherboards received a new relevant chip even if no crack or other failure was detected in that motherboard's original chip.  *Id.* ¶ 61.  Starting October 23, 2008, replacement motherboards for one type of configuration of Atlantis and Apollo units (the discrete configuration) have been equipped with a chip consisting of a different material that is not subject to cracking from heat-cycling.  *Id.* ¶¶ 62; 32.  Since December 7, 2008, replacement boards for the other configuration (UMA) were switched to chips with the same material.[9]  *Id.*; *see also* Larson Dec. ¶¶ 17-19.

The data demonstrate that HP provided hundreds of thousands of repairs, although still only a small percentage of the total universe of Atlantis/Apollo units.[10]  There are 1,776,951

---

[8]   http://h10025.www1.hp.com/ewrfr/wc/document?docname=c01087277&lc=en&cc=us

[9]   These changes may not have applied to approximately 1,100 Atlantis repairs between May 2009 and February 2010.  Hodge Dec. ¶ 62 n.1; *cf.* Declaration of Gerald Larson ("Larson Dec.") ¶ 20 (indicating over 29,000 Atlantis repairs since May 2009).

[10]   No attempt from Plaintiffs to take the terms "class issue" and "epidemic failure" out of context (Pls.' Br. at 5) can change the data described herein.  *See also* Ex. 5 at 206-07; 136-40. According to Plaintiffs, HP believes "a field failure rate over 8.5%" is unacceptable.  Pls.' Br. at 6

1   Atlantis/Apollo notebooks in HP's customer installed base ("CIB") (*i.e.*, total shipments less

2   returns from unsold units) – 512,220 Apollo and 1,264,731 Atlantis.  Larson Dec. ¶ 4.  Through

3   December 2009, whether under the Program or otherwise, HP provided a free motherboard

4   replacement for 304,588 units (*i.e.*, 17.14% of the 1,776,951 CIB).[11]  *Id.* ¶¶ 11, 13.[12]

5   Conversely, of the nearly 1.8 million Atlantis and Apollo CIB, 1,472,393 (82.86%) have never

6   received an in-warranty or Program motherboard replacement as of December 2009.  *Id.* ¶ 13.

7   Stated differently, nearly 4 years after HP first shipped an Atlantis/Apollo unit, only

8   approximately 17% have been submitted for and received a free motherboard replacement under

9   HP's Limited Warranty or the Program.[13]

10  **E.     Plaintiffs And Their Varying Experiences.**

11       Plaintiff Shifflette is a Virginia resident who bought an HP Pavilion dv6000 series

12  notebook computer on October 15, 2006 from CompUSA in Virginia and only used his computer

13  outside of California.  *See* Ex. 7 at 7:11-13; 62:5-17; Ex. 8; Ex. 7 at 84:8-20; 121:16-122:6;

14  127:3-129:22.  No communication from HP contributed to any expectation Plaintiff Shifflette

15  claims he had regarding the longevity of his wireless functionality.  *See id.* at 109:15–110:13;

---

16  n.3.  Taking Plaintiffs' view, it follows logically that HP's view of an unacceptable level of

17  failures is exponentially lower than that required even to suggest a common *classwide* wireless failure.  *See also* Hodge Dec. ¶¶ 70-74 (correcting Plaintiffs' mischaracterization of ARR); Pls'

18  Br. at 6.
    [11]  For the reasons explained in Mr. Larson's declaration, the number of unique units

19  receiving a repair likely is overstated in Plaintiffs' favor.  Larson Dec. ¶ 11.  Moreover, the different configurations of Atlantis/Apollo units received different numbers of repairs.  Out of

20  1,723,091 UMA Atlantis/Apollo units, 262,642 (15.24% of UMA CIB; 14.78% of Total CIB) received a free motherboard replacement.  *Id.* ¶ 15.  Only 22,322 of those units (1.29% of UMA

21  CIB; 1.25% of Total CIB) ever received a subsequent repair.  *Id.*  Of the 53,854 discrete CIB, 19,553 (36.30% discrete CIB; 1.1% Total CIB) received at least one motherboard replacement.

22  *Id.* ¶ 16.  Only 5,495 (*i.e.*, 10.20% of discrete CIB) received more than one repair.  *Id.*  An additional 20,660 UMA repairs (1.19% UMA CIB; 1.16% Total CIB) and 1,703 discrete repairs

23  (3.16% discrete CIB; 0.10% Total CIB) cannot be classified as either a first time or subsequent repair.  *Id.* ¶¶ 15, 16.

24  [12]  While a motherboard replacement is the most used repair under the Program, HP's repair naturally depends on the circumstances of the subject computer and its particular cause.  Ex. 6 at

25  214:7-12.  Therefore, if a different repair is required, HP provides that repair.  *Id.*
    [13]  In total, HP consumed 340,099 motherboards for Atlantis and Apollo repairs through

26  December 2009.  Larson Dec. ¶ 9.  Using motherboard replacements as the repair metric could overstate the number of wireless repairs because a motherboard replacement can be used to

27  address other issues.  Hodge Dec. ¶ 75.  Of all units receiving a motherboard replacement, owners of only 179,533, or 58.95%, had ever reported a connectivity problem – which itself is broader

28  than wireless failures (or even internet failures) – since August of 2007.  Declaration of James Bryan Norton ¶ 11.  Again, this ratio likely is overstated in Plaintiffs' favor.  *Id.* ¶¶ 9-11.

1   76:6-16; 107:10-20.  Plaintiff Shifflette claims he first experienced a wireless malfunction in

2   December 2007 – more than thirteen months after his purchase.  *See id.* at 123:14-21.  He

3   believes the wireless card in his computer was to blame for that alleged malfunction.  *Id.* at 175:8-

4   176:5.  Plaintiff Shifflette then bought an external wireless device for his HP computer in

5   Virginia on December 17, 2007 that allowed him to use the internet wirelessly – apparently the

6   same day he first experienced a wireless problem. *See id.* at 136:5-137:7; Ex. 9 at Resp. 11; Ex. 7

7   at 138:13-139:2; 139:10-12.  Plaintiff Shifflette did not take advantage of the free repair HP

8   offered under the Program.  Ex. 9 at Resp. 14.

9          Plaintiff Fromkin is a Florida resident who bought an HP Pavilion notebook computer

10  from a Circuit City store in Florida in the summer of 2007 and only used her computer in Florida.

11  *See* Ex. 10 at 10:9-12; 40:18-41; Ex. 11; Ex. 10 at 144:8-11; 145:19-21.  Plaintiff Fromkin had

12  not seen any statements from HP about her computer before her purchase.  *See* Ex. 10 at 48:18-

13  50:6; 153:2-16.  Plaintiff Fromkin bought the computer with one of her credit cards and was

14  reimbursed from a college savings fund owned by her father and funded by others.  *See id.* at

15  52:9-53:18; 72:4-73:11; Ex. 12 at 109:19-120:7; 110:10-111:20; 111:21-112:13; 114:2-15.  No

16  communication from HP contributed to any expectation Plaintiff Fromkin claims she had

17  regarding how long she would be able to use the wireless capability in her computer.  *See* Ex. 10

18  at 126:18-127:5.  Although Plaintiff Fromkin received several free repairs from HP for her

19  computer, she never submitted her computer for a free repair under the Program. Ex. 9 at Resp.

20  14, 3.  According to Plaintiff Fromkin's mother, that is because she (Plaintiff Fromkin's mother)

21  had already spoken to putative class counsel, was engaged in litigation and concluded it was in

22  the "best interest of the class" that she not seek to have her daughter's computer repaired under

23  the Program.  *See* Ex. 12 at 284:22-285:9; 290:13-16.[14]

---

24  [14]     Plaintiff Fromkin does not know the names of any of her lawyers.  *See* Ex. 10 at 101:14-
21.  She learned that she was represented in this lawsuit from her mother, who Plaintiff Fromkin
25  testified suggested that she become a plaintiff.  *See id.* at 102:22-103:1; 101:2-7; 133:19-134:3.
Plaintiff Fromkin only spoke once to one of the lawyers representing her (and none of the others)
26  in this matter before her January 8, 2010 deposition, and that conversation occurred the week
before her deposition – approximately one year after Plaintiffs filed their SAC.  *See id.* at 104:11-
27  106:1.  She did not see that complaint until after Thanksgiving 2009 – again approximately a year
after it was filed.  *See id.* at 170:16-171:22.
28

Plaintiff Nygren, who considers himself a sophisticated computer user, is a Wisconsin resident who bought an HP dv6110 notebook computer at Office Depot in Wisconsin on January 14, 2007 and only used his computer in Wisconsin. *See* Ex. 13 at 6:21-24; 9:22-10:3; 59:19-60:23; 61:18-24; 107:7-13; 21:20-22:2; 23:12-18; 25:21-25; 123:14-17. Plaintiff Nygren claims he first experienced a wireless malfunction in August 2007. *See id.* at 112:18-113:1; 115:6-11. He did not contact HP for approximately a month (until October 2007), however, while he tried to resolve the issue himself. *See id.* at 118:19-23; 120:3-10; 125:15-18. During that time Plaintiff Nygren visited and posted on a forum on HP's website. *See id.* at 119:3-11. There, Plaintiff Nygren saw postings from other HP customers indicating that their wireless difficulties had been resolved and that some received replacement notebooks. *See id.* at 122:1-3; 133:20-24; 160:21-161:7; 238:20-239:12. Plaintiff Nygren decided never to send his computer into HP for a wireless repair either under his Limited Warranty or the Program, notwithstanding HP's invitation that he do so. *See id.* at 163:14-16; 198:1-7; 126:1-18; 127:3-18. Plaintiff Nygren eventually bought an external wireless device to connect to the internet wirelessly with his HP computer. *See id.* at 123:18-124:1;129:25-130:3.

Plaintiff Nygren has concluded (in part by taking his computer apart) that the cause of his wireless difficulty is that the design of his computer did not "allow for proper heat distribution. . . ." *See id.* at 134:23-135:8; 135:12-137:23; 142:8-9. Plaintiff Nygren also concluded that some uses would not generate sufficient heat to cause the wireless malfunction he claims he experienced, but rather only "usage that . . . uses the computer's capabilities in a maximum capacity for longer than normal periods of time." *See id.* at 139:2-19; 163:3-13; 228:15-22. Plaintiff Nygren also agreed that there can be more than one cause of a wireless failure and, therefore, that whether a repair would be successful depends, in part, on what happened to that computer and that a repair for one user might not necessarily work for another. *See id.* at 148:13-22; 162:18-163:13; 151:2-17.[15]

---

[15]    In approximately October 2007, Plaintiff Nygren received a communication from a person named Carey Holzman, who offered to put him in touch with one of his current counsel. *See* Ex. 13 at 27:1-30:20. Mr. Holzman mentioned that he believed he had a "fix" for the wireless difficulty Plaintiff Nygren claimed he was experiencing. *See id.* at 36:11-23. That "fix" was litigation, not a technical repair. *See id.* at 50:18-51:1; 189:24-190:6. Shortly thereafter, Plaintiff

1

## ARGUMENT

2

**A.**     **Plaintiffs Must Prove (Not Merely Allege) The Class Certification Requirements.**

3

4

        Class actions are procedural devices that cannot "'abridge, enlarge or modify any

5

substantive right' of any party . . . ."  *Cummings v. Connell*, 402 F.3d 936, 944 (9th Cir. 2005)

6

(citation omitted).  Plaintiffs bear the burden of proving all four threshold elements of Rule 23(a)

7

and one of the requirements of Rule 23(b).  *See Amchem Prods. v. Windsor*, 521 U.S. 591, 613-14

8

(1997).  Plaintiffs seek certification under Rule 23(b)(3) and therefore must prove that common

9

issues predominate over individual issues and that a nationwide class action is the superior

10

method of resolving purchasers' disputes, if any, with HP.  Fed. R. Civ. P. 23(b)(3).

11

        A court may grant class certification only if it determines "after a rigorous analysis" that

12

all of the Rule 23 requirements are satisfied.  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147,

13

160-61 (1982); *see also Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir.),

14

*amended by* 273 F.3d 1266 (9th Cir. 2001).  The court may "probe behind the pleadings" and

15

consider factors that are "'enmeshed in the factual and legal issues comprising the plaintiff's

16

cause of action.'"  *Gen. Tel. Co.*, 457 U.S. at 160-61 (citation omitted); *Hanon v. Dataproducts

17

Corp.*, 976 F.2d 497, 509 (9th Cir. 1992).  The court must ensure actual – not presumed –

18

conformance with Rule 23.  *See, e.g.*, *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th

19

Cir. 1996); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008);

20

*In re IPO Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006).

21

**B.**     **Plaintiffs Have Failed To Prove That Common Factual Issues Predominate.**

22

        The Rule 23(b)(3) predominance inquiry starts with the elements of the plaintiffs'

23

underlying claims so that the Court can determine what must be proven (and how) at trial.  *See

24

Zinser*, 253 F.3d at 1189.  For Plaintiffs' only remaining claim under the "unfair" prong of the

25

UCL, every putative class member must initially prove that he/she "suffered injury in fact and has

26

27

Nygren received an e-mail communication from one of his lawyers and this lawsuit followed.
*See id.* at 42:12-43:5.

28

1   lost money or property as a result of" HP's conduct.  Cal. Bus. & Prof. Code § 17204; Ex. 2 at

2   6:2-10.   To additionally prove "unfair" conduct, each purchaser must prove that his/her "[i]

3   consumer injury is substantial, [ii] is not outweighed by any countervailing benefits to consumers

4   or to competition, and is not an injury the consumer[] [himself/herself] could reasonably have

5   avoided."  *See Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 839 (2d Dist. 2006);

6   Ex. 2 at 7:27-8:3.[16]

7          Because Plaintiffs have not alleged an actionable representation/omission, it is HP's

8   Limited Warranty that defines its obligations to putative class members.  *See, e.g., Oestreicher v.*

9   *Alienware Corp.*, 322 F. App'x 489, 493 (9th Cir. 2009) ("A manufacturer's duty to consumers is

10   limited to its warranty obligations absent either an affirmative misrepresentation or a safety

11   issue.").  Warranty based claims are notoriously ill-suited for class certification, particularly with

12   the choice of law issues implicated by a putative nationwide class action – and this case is no

13   exception.  *See, e.g., Szabo v. Bridgeport Machs.*, 249 F.3d 672, 674 (7th Cir. 2001) (explaining

14   that "few warranty cases ever have been certified as class actions -- let alone as nationwide

15   classes, with the additional choice-of-law problems that complicate such a venture"); *Sanders v.*

16   *Apple Inc.*, No. C 08-1713, 2009 U.S. Dist. LEXIS 6676, at *29-30 (N.D. Cal. Jan. 21, 2009).

17   Any determination of whether each putative class member can prove a substantial injury that

18   he/she could not avoid and loss of money/property is complicated by predominating

19   individualized examinations, including whether he/she experienced a wireless failure, if so, when

20   and whether he/she received a repair for any such failure.[17]

21          **1.      Individualized Examinations Are Necessary To Determine Whether And**
22                 **When Any Putative Class Member Experienced A Wireless Failure.**

23          A product manufacturer does not act "unfairly" under the UCL where its product operates

24   without malfunction during its warranty period – even if it later malfunctions.   *See, e.g.,*

25   *Daugherty*, 144 Cal. App. 4th at 839; *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026-

---

26   [16]      HP has explained why common issues do not predominate in the context of the California
27   UCL because Plaintiffs have only asserted California law claims.  As explained below, however,
    California law cannot actually apply to Plaintiffs' claims.
28   [17]      *See, e.g., Zinser*, 253 F.3d at 1192 (explaining that certification under Rule 23(b)(3) is
    improper if "each class member has to litigate numerous and substantial separate issues to
    establish his or her right to recover individually. . . ."); *Amchem Prods.*, 521 U.S. at 623.

1  27 (9th Cir. 2008).  Accordingly, putative class members who (i) never experienced a wireless

2  failure or (ii) experienced any such failure outside of their Limited Warranty period have no UCL

3  claim.  Only individual examinations of each purchaser's experience can resolve these questions.

4      As one of HP's experts, Portia Bass, Ph.D., has explained, given the market segment into

5  which the putative class computers fall (the so-called mid-size and desktop replacement notebook

6  categories), they were likely often used in one location with a wired internet connection or used to

7  connect to the internet wirelessly through means other than their internal wireless capability that

8  Plaintiffs claim is faulty.  *See* Expert Report of Portia Bass ("Bass Rep.") ¶¶ 21, 22, 24, 32, 44-

9  48, 72, 81.  Logically, purchasers who did not use their wireless capability could not have

10 suffered an injury relevant to Plaintiffs' claims.  In addition, more than three years after HP first

11 shipped a putative class computer, only approximately 17% of the computers in HP's warranty

12 installed base received a free motherboard replacement under the Program or a customer's

13 Limited Warranty.[18]  Consequently, there is no evidence in the record (let alone evidence

14 common to every purchaser) of a uniform wireless failure among the putative class – and

15 Plaintiffs have not even attempted to argue otherwise.  *Cf. Gable v. Land Rover N. Am.*, No. 07-

16 376, 2008 U.S. Dist. LEXIS 82996, at *12-13 (C.D. Cal. Sept. 29, 2008) (rejecting class

17 certification where plaintiff did not prove classwide manifestation of alleged defect); Neu. Rep. at

18 2.

19     Similar individual inquiries are necessary to determine when any putative class member

20 experienced a wireless failure.  Unlike Plaintiffs Nygren and Fromkin, Plaintiff Shifflette claims

21 he experienced a wireless failure for the first time outside of his Limited Warranty period (more

22 than thirteen months after his purchase).  Ex. 7 at 123:14-21.  As Plaintiffs' own experience

23 confirms, there is no way short of examining each putative class member's experience to

24 determine whether any wireless failure occurred within his/her Limited Warranty period.

25     Another level of individual analysis further complicates the claims of purchasers who

26

---

27 [18]    This figure mirrors Plaintiff Nygren's own conclusion that only certain uses of the
28 putative class computers would cause the wireless failure he claims to have experienced.  Ex. 13
at 139:2-19; 163:3-13; 228:15-22.

claim to have experienced a wireless failure.  Even Plaintiffs' purported technical expert agreed that there are numerous potential causes of a wireless failure that are unconnected to the alleged "heat-cycling" defect that is the subject of Plaintiffs' claims.  Ex. 14 at 117:18-118:22; 120:5-13; Neu. Rep. at 2, 10, 13; Hodge Dec. ¶¶ 34-35, 63.[19]  Only an examination of each putative class member's computer and usage could determine whether any wireless failure was caused by an alleged "heat-cycling" defect or, for instance, an improperly configured computer/network or a virus.  Neu. Rep. at 2, 7, 10, 11, 14-15; Bass Rep. ¶¶ 28, 56, 82 (noting virus during relevant time period that caused wireless failures); Hodge Dec. ¶¶ 35, 63.   Plaintiff Nygren himself acknowledged that, in his view, other HP computer users experienced wireless failures from causes different than his.  Ex. 13 at 148:13-22; 162:18-163:13; 152:4-153:17; 153:14-154:1.

> **2.     Individual Examinations Are Necessary To Determine Whether Putative Class Members Received A Repair That Made Their Computers Operable For The Remainder Of Their Warranty Period.**

HP complies with its Limited Warranty if it repairs a customer's computer within the applicable warranty period so that it remains operable during that period, even if it later malfunctions.  *See, e.g., Long*, 2007 U.S. Dist. LEXIS 79262, at *12-13; *Brothers v. Hewlett-Packard Co.*, No. C-06-02254, 2006 U.S. Dist. LEXIS 82027, at *25 (N.D. Cal. Oct. 31, 2006).  Indeed, given the Court's focus on HP's Limited Warranty in the absence of a viable misrepresentation/omission claim from Plaintiffs, Plaintiffs' claim must necessarily be based on an alleged failure to receive a proper repair.  Again, Plaintiffs have offered no plausible way to identify those putative class members who received a warranty repair that made their computers operable for the remainder of their warranty period from a single body of evidence; nor could they.  As explained above, HP provided hundreds of thousands of repairs to customers and Plaintiff Nygren himself recognized that at least some purchasers reported their satisfaction with HP's repairs.  Ex. 13 at 122:1-3; 133:20-24.  Moreover, no common proof could identify the dates of every putative class member's repair and their post-repair experience.[20]

---

[19]     Plaintiffs' purported technical expert does not have an opinion regarding what caused their alleged wireless failures and, therefore, logically cannot have concluded that any such cause was common to other purchasers. *See* Ex. 14 at 121:5-21.

[20]     HP's Limited Warranty provides for the possibility of a refund only in the event of repeated failures and failed repairs. Ex. 4.  Thus, any putative class member's claimed right to a

### 3.     Individual Analysis Is Necessary To Determine Whether Each Putative Class Member Received A Repair Under The Program.

Instead of limiting Plaintiffs and putative class members to their Limited Warranty rights as it could have under the law, HP provided them with more than the benefit of their bargain through, *inter alia*, the Program and BIOS F.3D issued in December 2007.  Thus, while HP believes that no putative class member can sustain an "unfair" UCL claim because it provided more than it was required and more than the benefit of his/her bargain,[21] at the very least, putative class members who received a repair under the Program or a remedy through BIOS F.3D cannot show that HP acted unfairly toward them.  Plaintiffs' own circumstances show that these questions can only be answered through individual examinations.  Whereas HP performed hundreds of thousands of repairs and BIOS F.3D was downloaded almost 380,000 times, Plaintiffs all chose not to take advantage of the Program's free repair.  Plaintiff Nygren preferred this lawsuit as his "fix" and Plaintiff Fromkin's mother believed it was best for the "class" if her daughter did not seek a Program repair.  Ex. 13 at 50:18-51:1; 189:24-190:6; Ex. 12 at 284:22-285:9; 290:13-16.  Proof common to every putative class member, therefore, cannot answer the question of which putative class members took advantage of HP's Program or other repairs.[22]

An examination of the nature and effectiveness of any repair a putative class member received (whether under the Program or otherwise) is further complicated by the fact that HP identified and resolved at least three possible causes of wireless failures with different remedies.  *See* § C of Facts Section, *supra.*  Not to mention that repairs under the Program changed technologically several times.  *See id.*  Thus, to the extent Plaintiffs claim that HP's repairs were inadequate for every putative class member, individual inquiries are necessary to determine

refund is bound up with the same individualized inquiries regarding their repair history.  Not to mention that some putative class members (like Plaintiffs Shifflette and Fromkin at least) did not even request a refund from HP.  Ex 9 at Resp. 12.

[21]     *See, e.g.*, *Hall v. Time, Inc.*, 158 Cal. App. 4th 847, 854-55 (4th Dist. 2008); *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1591 (4th Dist. 2008).

[22]     Plaintiffs' proposed trial plan does nothing to attempt to explain how these and other individualized inquiries could be tried on a classwide basis.  Plaintiffs merely state in conclusory fashion that they will use common evidence to prove the elements of their claim, but they do not explain the content of that evidence.  Likewise, none of Plaintiffs' cited cases (Pls.' Br. at 3) addressed the malfunction, repair, and knowledge issues present here that preclude class certification.

1   which, if any, repair each putative class member received and to analyze his/her post-repair

2   experience.[23]   As Plaintiff Nygren himself acknowledged, there is no single cause or repair

3   common to every putative class member.[24]

4          Even for putative class members who chose not to seek a repair under the Program or

5   otherwise, an examination of whether any harm they suffered could be characterized as

6   "substantial" requires individual analysis.  For instance, Plaintiff Fromkin testified that use of her

7   mother's computer as a replacement for her own satisfied all of her computing needs.  Ex. 10 at

8   111:14-21.  An analysis of whether any harm she suffered could be "substantial" is different from

9   an analysis for a purchaser who claims he/she was left without access to a functioning computer.

### 4.   Plaintiffs' Purported Economic Expert Cannot Establish Common Economic Injury Or An Appropriate Aggregate Restitution Calculation.

12         Plaintiffs' evidence of common economic injury is from their purported economic expert

13  (Dr. Russell Lamb), who opines that all putative class members have suffered a common injury

14  merely because they bought putative class computers – whether they experienced a wireless

15  failure at all (in or out of warranty) or received an adequate repair.  *See* Pls.' Br. at 11:6-12.  As

16  explained above, however, purchasers who never experienced a wireless failure, experienced such

17  a failure outside of their warranty period or from a cause other than an alleged defect (like a

18  virus), received a repair during their warranty period or received a repair under the Program or

19  through a BIOS update suffered no injury and cannot recover as a matter of law.  For the same

20  reason, Dr. Lamb's claim that he can calculate an aggregate classwide restitution award based on

21  common proof is an improper use of fluid recovery that the Ninth Circuit rejected in *In re Hotel

22  Telephone Charges*, MDL No. 89, 500 F.2d 86 (9th Cir. 1974).  Pls.' Br. at 11:9-11.[25]  Under that

---

23  [23]     Plaintiffs' suggestion that the Program shows common issues predominate (Pls.' Br. at 14)

24  ignores the reality that not every purchaser (including Plaintiffs) took advantage of the Program, that repairs under the Program varied over time and that the repair data HP explained above

25  shows that the vast majority of computers never received a free motherboard replacement in response to a customer's decision to submit his/her computer for repair.

26  [24]     Plaintiff Nygren believes that a replacement motherboard that incorporates HP's BIOS F.3D may very well resolve what he refers to as the "heat issue."  *See* Ex. 13 at 165:22-166:13;

27  197:16-25.  Plaintiff Nygren also testified that, for any computer user who had not experienced a crack as Plaintiff Nygren believes he did, HP's BIOS F.3D could have prevented such cracks.

28  *See id.* at 167:5-10.

[25]     *See also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008).

case, any aggregate monetary relief award cannot include recovery for putative class members who do not have viable claims. Here, because Dr. Lamb's proposed calculation includes monetary relief for many such purchasers, it is improper and contrary to the law. In truth, no such classwide calculation is possible. *See generally* Expert Report of Timothy Bresnahan; HP's Motion to Strike Dr. Lamb's Report.[26]

### 5. HP's Pre-Sale Knowledge Is Not Subject To Common Proof.

Putative class members must prove that HP knew before it shipped their computers of the alleged wireless defect they claim they experienced. *See Klein v. Earth Elements, Inc.*, 59 Cal. App. 4th 965, 969 (1st Dist. 1997) (holding that "the unintentional distribution of a defective product" is "beyond the scope" of the UCL); *see also Long*, 2007 U.S. Dist. LEXIS 79262, at *24-25; *Brothers*, 2006 U.S. Dist. LEXIS 82027, at *25. Common proof cannot answer that question. As HP explained – and Plaintiffs' purported technical expert agreed – HP learned of different possible causes of wireless failures at different times. Hodge Dec. ¶¶ 36, 43, 46; Lang. Rep. ¶¶ 24, 34, 45; Ex. 14 at 161:18-23; 131:4-8; 150:4-151:17. Thus, to determine whether HP knew of any problem in a putative class member's computer who experienced a wireless failure, one must first identify that particular problem and determine the date of that putative class member's purchase. Only individualized class member-by-class member examinations can resolve those issues.[27]

---

[26] Moreover, Dr. Lamb has ignored the need to examine each putative class member's experience to determine what, if any, restitution he might recover. A purchaser who receives, for instance, eleven months of failure-free use of his/her computer cannot logically recover the same restitution (if any) as one who claims to have received one month and no adequate remedy. *Cf., e.g., Colgan v. Leatherman Tool Group*, 135 Cal. App. 4th 663, 676-77 (2d Dist. 2006) (citing trial court's statement that "it would be 'inequitable' to return to consumers the entire purchase price paid for the tools . . . because . . . 'Class members did benefit from the quality, usefulness, and safety of [tools].'").

[27] Plaintiffs have relied at times on their alleged expectations regarding the longevity of the wireless capability in their computers but, as explained above, HP is obligated to comply with its Limited Warranty – not Plaintiffs' expectations about the life of a product. *See Hoey v. Sony Elecs.*, 515 F. Supp. 2d 1099, 1105 (N.D. Cal. 2007); *Oestreicher*, 544 F. Supp. 2d at 972. In addition, each Plaintiff testified that nothing HP said contributed to his/her alleged expectation. Ex. 13 at 108:3-14; Ex. 7 at 109:15-110:13; 76:6-16; 107:10-20; Ex. 10 at 126:18-127:5. HP cannot be liable for failing to satisfy expectations it did not create. *See Seely v. White Motor Co.*, 63 Cal. 2d 9, 18 (1965); *Hoey*, 515 F. Supp. 2d at 1105; *Morgan v. Harmonix Music Sys.*, No. C 08-5211, 2009 U.S. Dist. LEXIS 57528, at *19 (N.D. Cal. July 7, 2009). Therefore, even if a theory based on their alleged expectations were viable, Plaintiffs' contention would only introduce additional individualized inquiries regarding the cause of any purchaser's alleged

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 6.    Plaintiffs Cannot Ignore Absent Class Members.

According to Plaintiffs, *Tobacco II* requires this Court to ignore how the claims of absent class members would be tried because, unlike Plaintiffs, they need not prove injury and causation and, therefore, their experience is irrelevant to the class certification inquiry.  Pls.' Br. at 21:21-22.  Whatever *Tobacco II*'s impact in California state court, it cannot create a rule in federal court where absent class members have different elements for their claims than named plaintiffs.  The Supreme Court's recent decision in *Shady Grove* demonstrates as much.  As the Court explained, in *federal* court, Rule 23 and federal law (including the Rules Enabling Act) require named plaintiffs in a class action and absent class members alike to prove the same elements of their claims – and a state court cannot overturn that rule.  *See Shady Grove*, 2010 WL 1222272, at *8 ("A class action . . . merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits. . . .  [I]t leaves the parties' legal rights and duties intact and the rules of decision unchanged.").  Stated differently, the Rules Enabling Act precludes Plaintiffs' argument that Rule 23 (let alone a state court decision) changes the substantive (and constitutional) right defendants have only to face liability to claimants who actually prove the elements of their claims.  *See* 28 U.S.C. § 2072(b); *Cummings*, 402 F.3d at 944 ("[T]he mere fact that a case is proceeding as a class action does not allow the district court to vindicate the rights of the individually named plaintiffs differently as compared to the absent class members."); *Hotel Tel. Charges*, 500 F.2d at 90; *see also McLaughlin*, 522 F.3d at 231.[28]

Article III of the Constitution, which limits federal jurisdiction only to "cases" and

---

expectation.

[28]    As other courts have noted, that portion of *Tobacco II* upon which Plaintiffs rely does not preclude the Court from examining absent class members' circumstances at the class certification stage to determine, *inter alia*, whether common evidence can show that the defendant did, in fact, act improperly toward each putative class member in the same way and whether each putative class member could state a valid claim for relief.  *See, e.g., Cohen v. DirecTV*, 178 Cal. App. 4th 966, 981 (2d Dist. 2009); *Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 850 (4th Dist. 2009); *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622 (2d Dist. 2010).

"controversies" where claimants have suffered actual injury-in-fact caused by the defendant's allegedly wrongful conduct, dictates the same result. *See, e.g.*, *Burdick v. Union Sec. Ins. Co.*, No. 07-4028, 2009 U.S. Dist. LEXIS 121768, at *6 (C.D. Cal. Dec. 9, 2009).[29]  In federal court, no absent class member may recover who does not himself/herself satisfy Article III's injury-in-fact and causation requirements – and, again, no state law decision can change that rule.[30]

Plaintiffs' attempt to create different elements for claims asserted in a class action depending on whether the claimant's name appears in the caption of the lawsuit would lead to absurd and illogical results in product defect/repair lawsuits like this.[31]  Under Plaintiffs' proposal, a computer purchaser who never tried to use the wireless capability in his/her computer, or who never experienced a wireless malfunction, or who experienced such a malfunction but received a repair, or who experienced such a malfunction only outside of his/her Limited Warranty period could recover money from HP because someone else filed suit on their behalf – even though *Daugherty*, *Long* and other cases would require dismissal of that purchaser's claims if they sued in their own right.  Also under Plaintiffs' proposal, a defendant manufacturer who sells one malfunctioning product out of 10 million units could face class action exposure driven by that larger figure if the purchaser of the sole malfunctioning product sues because the circumstances of the remaining 9,999,999 are irrelevant to class certification.  That result is illogical and it is not surprising, therefore, that it is prohibited in federal court.

## C.   Common Legal Questions Do Not Predominate Because The Court Must Apply The Law Of Each Putative Class Member's Home State.

Putative class members (like Plaintiffs) likely bought and used their computers in their

---

[29]    Proposition 64 incorporated Article III's injury-in-fact requirement into the UCL.  *See, e.g., Birdsong v. Apple, Inc.*, 590 F.3d 955, 959-60 & n.4 (9th Cir. 2009).

[30]    *See Burdick*, 2009 U.S. Dist. LEXIS 121768, at *10-11 ("Moreover, other courts have found that class definitions should be tailored to exclude putative class members who lack standing."); *Sanders*, 2009 U.S. Dist. LEXIS 6676, at *28; *Laster v. T-Mobile USA*, No. 05-1167, 2009 U.S. Dist. LEXIS 116228, at *11-12 (S.D. Cal. Dec. 14, 2009) (explaining that states "have no power directly to enlarge or contract federal jurisdiction").

[31]    *Tobacco II* was not a product defect/repair case.

home states. California simply has no material interest in compensating out-of-state purchasers for alleged injuries that occurred outside of California, if anywhere. That is particularly true here because virtually every act from HP regarding the putative class computers occurred outside of California. HP's notebook group is located in Texas and the subject computers were designed and tested outside of California before they were sold to the public. Therefore, Plaintiffs' proposed nationwide class action is unmanageable because it would require the application of all 50 states' laws.[32] In an attempt to avoid that result, Plaintiffs seek to apply California law uniformly on the theory that "[n]o conflict exists among consumer protection laws" across the country and no state other than California "has an interest in applying its own law" to the claims of its residents. Pls.' Br. at 17:16, 18:1. Plaintiff's simplistic approach is untenable. Another Court in this District already refused to certify a nationwide UCL class against HP because state consumer protection laws differ in important ways and putative class members' home states have the greatest interest in their claims. *See, e.g., In re HP Inkjet Printer Litig.*, No. C 05-3580, 2008 U.S. Dist. LEXIS 56979, at *20-22 (N.D. Cal. July 25, 2008). The same result follows here.[33]

There are material outcome determinative differences among state consumer protection statutes. *See, e.g., Zinser*, 253 F.3d at 1187 (requiring determination of conflicts in law as first step in California choice of law analysis).[34] Those conflicts manifest themselves in important

---

[32]     *See, e.g., Zinser*, 253 F.3d at 1188-89; *see also Gartin v. S&M NuTec LLC*, 245 F.R.D. 429, 439 (C.D. Cal. 2007) (citing *Zinser*, 253 F.3d at 1189); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1018 (7th Cir. 2002) ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 568 (E.D. Ark. 2005).

[33]     Plaintiffs' reference to the California choice-of-law clause in HP's agreement with Nvidia (Pls.' Br. at 15) is a red-herring. That agreement governs claims between HP and Nvidia – not computer purchasers. In addition, Plaintiffs cannot have it both ways. Having decided not to sue Nvidia, they cannot be heard to rely on Nvidia's conduct to support their choice-of-law arguments.

[34]     *See, e.g., Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349, 352-55 (Tex. App. 2003) (listing "substantial" conflicts in states' consumer protection laws); *Fink v. Ricoh Corp.*, 839 A.2d, 942, 974-82 (N.J. Super. Ct. Law Div. 2003) (same); *In re Bridgestone/Firestone*, 288 F.3d at 1017-18 ("State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's laws to sales in other states with different rules."); *Agostino v. Quest*

ways here.  While the UCL limits monetary relief to restitution and does not provide for punitive damages, other states' consumer protection statutes permit traditional compensatory and punitive damages.  *See* Ex. 15.  In addition, the test under *Daugherty* for proof of "unfair" prong UCL claims does not exist in every state and, therefore, the fundamental elements of state consumer protection claims differ in ways important to this case.  These differences are in addition to important scienter/knowledge variations among state law.  *See id.*  And, some putative class members would not even be entitled to bring a private right of action under their home statute. *See id.*[35]

The state in which a product purchaser resides has a clear interest "in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws. . . . by virtue of each state being the place in which plaintiffs reside, or the place in which plaintiffs bought and used their allegedly defective [products] or the place where plaintiffs' alleged damages occurred."  *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997).  On the other hand, it is unclear what interest, if any, California has in applying its law to claims of non-California residents for injuries allegedly incurred outside California.  Indeed, Plaintiffs' computers were not designed in California and Plaintiffs have not even alleged otherwise – because they could not. HP's notebook computer group is headquartered in Houston, Texas.  *See* Hodge Dec. ¶ 3.  The design, pre-launch testing, and assembly of Plaintiffs' model computers occurred almost exclusively and primarily outside of the United States in either Taiwan or China, with some testing and support done in Texas.  *Id.* ¶¶ 6-26.  No part of that process occurred in California – at

---

*Diagnostics*, 256 F.R.D. 437, 461 (D.N.J. 2009); *see also* Ex. 15; *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005); *In re Prempro*, 230 F.R.D. at 564.
[35]      None of Plaintiffs' cases helps them. Pls.' Br. at 1716-28.  *Hanlon* certified a *settlement* class and did not discuss the differences among the states' consumer protection laws.  *Wershba* likewise certified a settlement (not litigation) class and expressly noted the difference between the two.  *Washington Mutual Bank* did not find that the states' consumer protection laws are without conflict and, in fact, expressly indicated it was not deciding that issue.

HP's corporate headquarters in Palo Alto or otherwise. *Id.* ¶¶ 7, 10, 13, 15, 18, 19, 20, 23, 25, 26. HP's BIOS F.3D was developed outside of California and the motherboards used in the repair process were manufactured outside of the United States. *Id.* ¶¶ 51, 60. Similarly, HP's Palo Alto headquarters does not, at any given point, have involvement in or ultimate responsibility over the execution of the development, design, pre-launch testing, and evaluation of HP's notebook computers throughout their life cycle, including the Atlantis and Apollo series notebooks Plaintiffs bought. *Id.* ¶¶ 7, 10, 13, 15, 18, 19, 20, 23, 25, 26, 59.[36] To the contrary, for the United States market, the development and planning stage for HP's notebook computers (including Plaintiffs' models) occurs in Texas. *Id.* ¶ 7. The Program is also not a California creation. Decisions regarding the implementation and management of the Program were made from HP's Houston facility. Nuss. Dec. ¶ 12. Likewise, the great majority of repairs to Atlantis and Apollo notebooks (approximately 76%) were made outside of California. *See* Declaration of Troy Williams ¶¶ 6-7.[37]

California has no interest in ensuring that non-California residents are compensated under California law, or deterring conduct that occurred in any other state. Indeed, the presumption against the extraterritorial application of California statutory law evidences California's disinterest in undertaking the "special obligation" of adjudicating non-resident class members' claims where the allegedly offending conduct does not emanate from California. *See Osborne v. Subaru of Am.*, 198 Cal. App. 3d 646, 662-63 (3d Dist. 1988). Nevertheless, if California has any

---

[36]     Plaintiffs' unsupported assertion that HP's personnel in Palo Alto "were ultimately responsible for decisions concerning" the computers at issue (Pls.' Br. at 15) is unfounded, as HP's declarations from Mr. Hodge and Ms. Nussbaumer demonstrate. Beyond that, Plaintiffs have mischaracterized Mr. Roesch's e-mail (Ex. 30 to Ram Declaration) – which in any event was written months after the last Plaintiff bought her notebook. As HP explained, Mr. Roesch's team is not part of the notebook computer team and any testing he performed included additional parts not at issue in this case and was, in any event, directed and framed by HP's Houston facility. Hodge Dec. ¶ 69. Plaintiffs have also ignored their own allegations, which focus on the *design* of their computers that occurred outside of California. *See also* Hodge Dec. ¶¶ 27, 29 (identifying additional acts outside of California).

[37]     That some computers were repaired in California only introduces additional individual choice-of-law issues associated with identifying those putative class members.

interest in applying its law to claims arising from computers bought and used outside of California, that interest is far outweighed by the interests each resident's home state has in applying its laws to the claims of its residents. Courts have consistently concluded that "each plaintiff's home jurisdiction has a stronger interest in deterring foreign corporations from personally injuring its citizens and ensuring that its citizens are compensated than [the state of defendant's principal place of business] does in deterring its corporate citizens' wrongdoing." *See In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 456 (E.D. La. 2006); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 278 (D. Mass. 2004) ("States have a strong interest in protecting consumers with respect to sales within their borders, but they have a relatively weak interest, if any, in applying their policies to consumers or sales in neighboring states.") (quotation omitted).[38]

That is particularly true here because the UCL does not provide for treble or punitive damages, but rather only the return of money to the plaintiff (*i.e.*, restitution) – a clear indication that any interest in deterring/punishing conduct is secondary to its interest in returning funds to plaintiffs. The fact that HP's principal place of business is in California is an insufficient basis for the

---

[38]     *See also Spence v. Glock, GES.m.b.H.*, 227 F.3d 308, 314 (5th Cir. 2000); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 457 (D.N.J. 1998); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 211-12 (E.D. Pa. 2000) (explaining that "[a]ll of the relevant jurisdictions have an interest in utilizing the state statute crafted by their state's legislature to protect their consumers and/or residents"); *Oresman v. G.D. Searle & Co.*, 321 F. Supp. 449, 451 (D.R.I. 1971) (noting that "Rhode Island has a paramount interest in applying its own law to protect its domiciliaries from defective products shipped into that state"); *Terry v. Pullman Trailmobile*, 376 S.E.2d 47, 51 (N.C. Ct. App. 1989) (citing precedent holding that "the state where the sale occurred 'has a significant interest in applying the social and economic policies embodied in its own law of warranty,'" and that "[t]hese policies include protecting the State's citizens from commercial movement of defective goods into the State") (citation omitted); *Bridgestone/Firestone*, 288 F.3d at 1018; *In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 317-318 (S.D. Ill. 2007); *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 612 (S.D.N.Y. 2005); *see also Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364, 378 (D.N.J. 2004) (explaining that "the deterrence of interest of New Jersey as the domicile and locus of the defendant manufacturer must yield in this case to the compensation interest of Pennsylvania"); *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 414 (E.D. Pa. 2006) ("State consumer protection acts are designed to protect the residents of the state in which a deceptive act occurs or the individual resides and therefore the state where the individual resides has an overriding interest in applying the law of that state.") (citation omitted); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction.").

application of that state's law to non-residents, particularly because the design of HP's computers did not occur in California.[39]  *See, e.g.*, *Bridgestone/Firestone*, 288 F.3d at 1018.[40]

### D.   This Class Action Is Not A Superior Method Of Adjudication And Plaintiffs Are Neither Typical Nor Adequate Class Representatives.

This class action is not superior, but rather presents insuperable manageability problems, including individualized questions of injury, causation and the application of each state's law. *See Zinser*, 253 F.3d at 1190.  Plaintiffs' varying individual experiences also preclude a finding of typicality or adequacy because their claims necessarily arise from core facts that will not apply to certain other purchasers.  For instance, Plaintiffs cannot be typical of putative class members who chose to take advantage of HP's free Program repair or who never experienced a wireless failure (or who experienced a wireless failure from a different cause than Plaintiffs claim).  Likewise, Plaintiff Shifflette cannot be typical of purchasers who claim to have experienced a wireless failure within their Limited Warranty period and Plaintiff Fromkin is not typical of purchasers who actually expended their own money for their computers without reimbursement from another

---

[39]     *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 83 (D. Mass. 2005) (noting that "Courts have generally rejected application of the law of a defendant's principal place of business to a nationwide class"); *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 228 (S.D. Fla. 2002); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 207, 214 (D. Minn. 2003); *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1086 n.3 (N.J. 2007) ("As the appellate panel noted, certification of a nationwide class is 'rare,' and application of the law of a single state to all members of such a class is even more rare.") (citation omitted).  Plaintiffs' cases do not help them. Pls.' Br. at 16, 20.  The choice-of-law analysis in *Keilholtz* does not follow California's choice-of-law rules, but in any event, the reason the Court found no conflict in state consumer protection law does not apply here because Plaintiffs no longer assert CLRA claims.  There was also a far greater connection between the defendant's alleged misconduct and California than exists in this case.  There was also no discussion in that case of the issues that preclude class certification here (*i.e.*, malfunction, causation, repair and knowledge issues).  The *Parkinson* court's denial of class certification for the plaintiff's warranty claim supports HP in this case.  The UCL claims in that case were also misrepresentation/omission based (no longer the case here) and there was a greater connection between the defendant's conduct and California than in this case.  *Clothesrigger* is a state case that did not decide to apply California law on a nationwide basis.  *Wershba* was decided in the context of a settlement, not litigation, and the court's reliance on the California False Advertising Law does not apply here.  There was no UCL discussion in *Church* and the court employed an incorrect choice-of-law analysis comparing the effect of certifying a class against not.  There was no UCL choice-of-law analysis in *Lymburner*, which in any event included no discussion of the issues that preclude class certification in this case.

[40]     Application of each purchaser's home state's law would also not upset Plaintiffs' expectations.  They all testified they had no expectation about what law would govern their claims.  Ex. 13 at 125:3-10; Ex. 7 at 169:9-20; Ex. 10 at 145:22-146:5.

source. *Cf., e.g., Kandel v. Brother Int'l Corp.*, No. 08-1040, 2010 U.S. Dist. LEXIS 23493, at *5-11 (C.D. Cal. Feb. 1, 2010).[41] Moreover, according to Plaintiffs' counsel, some purchasers could assert legal theories not found in this case. The day after Plaintiffs filed their motion for class certification, their counsel filed another putative nationwide class action arising from the same basic allegations (*Perron, et al. v. Hewlett-Packard Co.*, Case No. C 10-00695 (JW)) that, according to them, asserts "additional legal theories" not found in this case.[42] Plaintiffs' claims are logically not typical of claims asserted under different legal theories (which will be lost under *res judicata* through this case).[43]

## CONCLUSION

The Court should deny Plaintiffs' motion for nationwide class certification.

Dated: April 13, 2010                    MORGAN, LEWIS & BOCKIUS LLP


                                         By     /s/ Kristofor T. Henning
                                              Kristofor T. Henning
                                              Attorneys for Defendant
                                              Hewlett-Packard Company

---

[41]     HP will describe this unique defense to Plaintiff Fromkin's claim in more detail its upcoming motion for summary judgment. *See Hanon*, 976 F.2d at 508 (explaining that unique defenses preclude typicality).
[42]     *See* Ex. 16 at 2.
[43]     Plaintiffs' suggestion that Quanta is indemnifying HP for this matter (Pls.' Br. at 6) is incorrect. Plaintiffs have referred to a non-wireless issue remedied in the past. Hodge Dec. ¶ 67.

1

**PROOF OF SERVICE**

2

    I, Kristofor T. Henning, hereby certify that on June 3, 2010, I caused the foregoing
document titled **HEWLETT-PACKARD COMPANY'S MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION**, previously filed under seal on April 13, 2010, to be
electronically filed and served upon the persons named below via the ECF system.  This
document is available for review and downloading from the ECF system.

3

4

5

6

MICHAEL F. RAM
mram@ramolson.com
RAM & OLSON LLP
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: 415-433-4949
Facsimile:  415-433-7311

7

8

9

10

11

MARC H. EDELSON
medelson@edelson-law.com
EDELSON & ASSOCIATES, LLC
45 W. Court Street
Doylestown, PA 18901
Telephone:  215-230-8043
Facsimile:  215-230-8735

12

13

14

15

JEFFREY L. KODROFF
jkodroff@srkw-law.com
JOHN A. MACORETTA
jmacoretta@srkw-law.com
SPECTOR, ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: 215-496-0300
Facsimile:  215-496-6611

16

17

18

19

20

21

Attorneys for Plaintiffs

22

23

Dated:  June 3, 2010      By: ___/s/ Kristofor T. Henning_____
Kristofor T. Henning

24

25

26

27

28