1  HOWARD HOLDERNESS (SBN 169814)
   MORGAN, LEWIS & BOCKIUS LLP
2  One Market, Spear Street Tower
   San Francisco, CA 94105
3  Telephone: 415.442.1000
   Facsimile: 415.442.1001
4  E-mail: hholderness@morganlewis.com
5
   KRISTOFOR T. HENNING (PAB 85047)
6  (*Pro Hac Vice*)
   FRANCO A. CORRADO (PAB 91436)
7  (*Pro Hac Vice*)
   MORGAN, LEWIS & BOCKIUS LLP
8  1701 Market Street
   Philadelphia, PA 19103
9  Telephone: 215.963.5000
   Facsimile: 215.963.5001
10 E-mail: khenning@morganlewis.com
   E-mail: fcorrado@morganlewis.com
11
   Attorneys for Defendant
12 HEWLETT-PACKARD COMPANY

13

14               UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
15                   SAN JOSE DIVISION

16 NATHAN NYGREN, STEPHEN              Case No. 07-CV-05793 (JW)
17 SHIFFLETTE and AMY FROMKIN, on
   behalf of themselves and all others  **DECLARATION OF RICHARD HUNT
18 similarly situated,                   HODGE IN SUPPORT OF DEFENDANT
                                         HEWLETT-PACKARD COMPANY'S
19          Plaintiffs,                  OPPOSITION TO PLAINTIFFS'
            v.                           MOTION FOR CLASS CERTIFICATION**
20
                                         Hearing:
21 HEWLETT-PACKARD COMPANY, a
   Delaware corporation,                 Date:      May 24, 2010
22                                        Time:      9:00 a.m.
            Defendant.                    Before:    Honorable James Ware
23                                        Courtroom: No. 8, 4th Floor
                                                     San Jose
24
25                                        Action Filed:   November 14, 2007
                                          Trial:          October 5, 2010
26

27

28      I, Richard Hunt Hodge, hereby declare as follows:

Case No. 07-05793 (JW)              1        DECLARATION OF RICHARD HUNT HODGE ISO
                                             HP'S OPPOSITION TO PLAINTIFFS' MOTION FOR
                                             CLASS CERTIFICATION

I, Richard Hunt Hodge, hereby declare as follows:

1.    I am over the age of 18 years and am fully competent to testify to the matters stated in this Declaration in Support of Hewlett-Packard Company's ("HP's") Opposition to Plaintiffs' Motion for Class Certification ("Declaration").  Since July of 2009, I have served as a Distinguished Technologist within the Notebook Quality, Service & Customer Experience division of HP's Personal System Group ("PSG"), and I am authorized to make this Declaration on HP's behalf.  Except as otherwise stated, I have personal knowledge of the facts set forth in this Declaration, and, if called to do so, would and could testify to the matters stated herein.

2.    I previously served as Director of Engineering and Quality for the Notebook Division within the PSG's Early Warning and Prevention Team ("EWP") from 2003 through July 2009.  I have been resident in HP's Houston, TX facility for my entire career with HP.

3.    HP's corporate headquarters are located in Palo Alto, California.  At all relevant times, HP's notebook computer group is headquartered in Houston, Texas with a presence in Taiwan.

4.    During my employment, HP has referred to product families by internal code name.  HP refers to a subset of dv9000 notebooks as the Apollo notebooks, but not all dv9000 notebooks are Apollo notebooks.  Likewise, HP refers to a subset of dv6000 and V6000 notebooks as the Atlantis notebooks, but not all dv6000 and V6000 notebooks are Atlantis notebooks.

5.    As Director of EWP, I was involved in both the pre-launch development and post-launch field analysis of the Atlantis and Apollo notebooks.  By way of example, I participated in weekly development review and status sessions regarding the Atlantis and Apollo notebooks and contributed to phase exit decisions relating to these products.  "Phase exit" refers to the process by which a platform is graduated from one design phase to the next.  Moreover, as described below, I supervised HP's early warning and prevention program for the Atlantis and Apollo notebooks.

6.    Before they were cleared for launch to the public, the Atlantis and Apollo units progressed through multiple design phases and a rigorous suite of validation, regression and

DECLARATION OF RICHARD HUNT HODGE ISO
HP'S OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION

1   development testing.

2       7.    Prior to the first design phase, there is a Definition and Planning phase, during

3   which HP engages in a "Request for Quote" process to design a concept for a notebook computer.

4   Part of the Definition and Planning phase includes selecting certain features of the notebook

5   computer. It is my understanding that, for the Atlantis and Apollo units sold in the United States,

6   the Definition and Planning phase, including the RFQ process, occurred in Texas and Taiwan.

7   No part of this phase, which is focused mainly on the design of the Atlantis and Apollo

8   notebooks, occurred in California

9       8.    The Design Build ("DB") testing phase, which focuses on the motherboard,

10   electrical system and software build, was the first design phase. The Atlantis and Apollo system

11   BIOS was developed during the DB phase. The BIOS is the notebook's boot firmware and is the

12   first code run by the notebook when powered on. The BIOS initializes basic functions and

13   system devices (such as the video display card, hard disk and floppy disk) so the notebook can

14   operate when booted.

15       9.    During DB for Atlantis and Apollo, between 10 and 15 prototype motherboards

16   and up to 50 prototype units were built and tested, primarily to ensure basic functionalities like

17   booting to an operating system. Atlantis and Apollo successfully completed this phase before

18   being graduated to the next phase.

19       10.    The DB testing phase for Atlantis and Apollo notebooks occurred primarily

20   outside of the United States in Taiwan or China, with minimal design support in Texas. No part

21   of the DB testing phase for Atlantis and Apollo notebooks occurred in California.

22       11.    The System Integration ("SI") phase followed the DB phase. SI focused on

23   compatibility between the Atlantis and Apollo software and hardware components. Wireless

24   compatibility with the overall system typically is configured during SI.

25       12.    SI for the Atlantis and Apollo lasted about 6 to 7 weeks. HP built between 150 -

26   200 prototype units and ran a battery of industry standard and HP proprietary tests nearly 24

27   hours a day for 3 to 4 weeks. The Atlantis and Apollo units successfully completed SI before

28   moving to the Product Validation ("PV") phase.

13.     The SI phase for Atlantis and Apollo notebooks occurred almost exclusively outside of the United States in Taiwan or China, with minimal support in Texas. No part of the SI phase for Atlantis and Apollo notebooks occurred in California.

14.     The PV stage also featured nearly around-the-clock industry standard and HP proprietary testing of 300 or more prototype units for a period of several weeks, this time incorporating any software and mechanical updates applied following the SI stage. Overall, PV takes about 6 to 7 weeks to complete. Atlantis/Apollo notebooks successfully completed PV.

15.     The PV stage for Atlantis and Apollo notebooks occurred entirely outside of the United States in Taiwan or China.

16.     Next is the Manufacturing Validation ("MV") phase, which sometimes is referred to as the preproduction phase. This was the last phase before the Atlantis and Apollo platforms were approved for production ramp.

17.     During MV, all industry standard and HP proprietary validation and regression tests were run against approximately 500 pilot Atlantis and Apollo units over about 4 weeks. Once testing was completed and all results and solutions determined satisfactory, Atlantis and Apollo cleared MV.

18.     The MV phase for Atlantis and Apollo notebooks occurred primarily outside of the United States in Taiwan or China, with some of the validation and regression testing completed in Texas. No part of the MV phase for Atlantis and Apollo notebooks occurred in California.

19.     All Atlantis and Apollo notebooks are assembled, shipped from into the channel, and mass produced in China. No part of the assembly or production of Atlantis and Apollo notebooks occurred in California.

20.     As part of the Atlantis and Apollo pre-launch testing, HP administered a series of communications tests to verify wireless functionality, including the wireless card's ability to interface with wireless networks and to operate without interference from any other notebook component. All Atlantis and Apollo communications tests passed prior to launch and revealed no unresolved problems, including without limitation, any alleged heat-cycling defect that is the subject of the plaintiffs' claims in this litigation. This communications verification testing for

Atlantis and Apollo occurred in Taiwan with support from personnel in Texas.

21.     Atlantis and Apollo units also underwent Highly Accelerated Life Tests ("HALT") during several of the pre-launch phases.  HALT is a severe industry standard stress testing methodology for accelerating product reliability by exposing the product to stress levels significantly beyond what the equipment will see in the field.  HALT is used to identify the limiting failure modes of a product and the stresses at which any such failures occur.

22.     The Atlantis and Apollo HALT testing, which included, *inter alia*, temperature cycling and random vibration testing, revealed no problems, including without limitation any alleged heat-cycling defect that is the subject of the plaintiffs' claims in this litigation.

23.     The Atlantis and Apollo HALT testing occurred between Texas and China.

24.     In all, nearly 7 months passed between the time when the Atlantis and Apollo platform builds began and the time the products were mass produced.  Over this time, HP tested approximately 1,000 prototype units across the different production phases.  In total, Atlantis and Apollo units were subjected to more than 100,000 aggregate test hours before being cleared for launch to the public.  The products first shipped in early-July 2006.

25.     As part of its normal manufacturing process, HP also tested each Atlantis and Apollo unit that was manufactured.  For instance, before being selected for use in a final product, each fully-equipped candidate Atlantis or Apollo motherboard was run for several minutes to confirm functionality.  Further, each fully assembled Atlantis and Apollo notebook was mounted to a test fixture and run for several hours.  Those that passed without incident were packaged and shipped.  For the most part, this testing occurred in China although personnel in Texas did provide some support functions.

26.     As an additional quality assurance measure, HP pulls a number of packaged units and executes an industry standard sampling analysis.  This too occurs in China with some support from Texas personnel.

27.     Each Atlantis and Apollo notebook features a motherboard housing many crucial system components, such as the Northbridge chip and the Southbridge chip.  The motherboard also provides connectors for other peripherals components such as disk controllers, Ethernet

1  network controllers, USB, sound cards, etc. All motherboards for Atlantis and Apollo notebooks
2  were designed by Quanta Computer Inc., HP's original design manufacturer ("ODM"), in
3  Taiwan.

4       28.     All communication in Atlantis and Apollo units between components connected to
5  a motherboard occurs through the Northbridge and Southbridge chips. The Northbridge chip, in
6  particular, communicates with the notebook's wireless card through a PCI-E bus (Peripheral
7  Component Interconnect – Express).

8       29.     Atlantis and Apollo motherboards were manufactured using a Northbridge chip
9  manufactured by NVIDIA Corporation – not HP. The particular chip present in Atlantis and
10 Apollo notebooks is known as a C-51 chip. The location code for the C-51 chip on the Atlantis
11 and Apollo motherboards is "U27." C-51 chips are manufactured outside of the United States.

12      30.     C-51 chips are built with "flip chip" technology. "Flip chip" refers to the method
13 of electronically connecting the chip die to the motherboard through a larger package carrier,
14 referred to as a substrate. The solder joints forming the interconnection points between the die
15 package and the substrate are referred to as "bumps." The bumps connecting the chip with the
16 substrate are known as "L1" bumps. L1 bumps are soldered to the substrate using a eutectic
17 solder paste that coats the bump to form the bond. The L1 connections are fortified using an
18 epoxy underfill applied between the die and substrate. The substrate likewise connects to the
19 motherboard through a series of balls. The balls connecting the substrate with the motherboard
20 are known as "L2" balls.

21      31.     Some, but not all, Atlantis and Apollo notebooks also are equipped with a
22 dedicated graphics processing unit, or "GPU," which is a specialized processor used primarily for
23 3-D applications.

24      32.     The Atlantis and Apollo configurations utilizing a GPU are referred to as
25 "discrete" notebooks. Those Atlantis and Apollo configurations without a GPU are "UMA"
26 (Unified Memory Architecture) notebooks. Atlantis and Apollo's discrete and UMA
27 configurations behave differently, largely because of the nuances in interactions between the
28 different component combinations and the thermal profiles of each.

33.     Securing a wireless internet connection is a technically complicated process that relies on the interaction of numerous internal components (*e.g.*, the Northbridge chip, wireless card, device manager, wireless antenna) and external factors such as network proximity and signal strength. Each of those internal and external factors is necessary, and must work, to secure and maintain a wireless connection.

34.     Indeed, there are multiple reasons why any given Atlantis or Apollo notebook might experience a wireless connection failure, including many that have nothing to do with "heat-cycling." By way of example, a notebook's wireless card may become loose or malfunction or the wireless network to which the user is attempting to connect could be out of range or improperly configured. Moreover, there could be synchronization issues between the notebook's wireless utility and the wireless button, or the wireless antenna can be damaged or become disconnected. There also could be multiple wireless routers in range preventing the wireless card from connecting properly, or even interference from wireless telephones that interrupts wireless connections. This list is by no means exhaustive, and is meant to illustrate the range of complications that might interfere with an Atlantis or Apollo (or any) notebook's ability to establish a wireless connection.

35.     From a symptomatic point of view, one symptom (including one symptom of a wireless failure) could result from more than one root cause. Therefore, to determine the cause of a wireless failure for any specific computer, it would be necessary to examine that computer.

36.     In late October/early-November 2006, HP learned that a limited number of C-51 chips had been damaged in September 2006 as a result of excessive pressure applied during NVIDIA manufacturing testing. In some cases, the excess pressure caused cracking at the corner of the C-51 chip die controlling the chip's PCI-E function and interrupted communications between the C-51 chip and the wireless card, resulting in a wireless connection failure.

37.     Through my communications with NVIDIA regarding the excessive pressure issue and my monitoring of its testing procedures, I am familiar with the quality control protocol NVIDIA implemented to contain this pressure issue and ensure that no (or as few as possible) affected chips were used to manufacture computers.

38.     For instance, NVIDIA executed a Scanning Acoustic Tomography test, or "SAT." Exh. 1 (HPNYGREN3662) at 2 ("Lots with yield below this level were 100% inspected using Scanning Accousting Tomography."). During the SAT test, each C-51 chip is submerged in water and pelted with ultrasound echoes. Any crack (otherwise referred to as a "separation" or "delamination") would appear "white" when subjected to the sonogram echo. *Id.* The SAT test also confirmed whether the pressure testing caused the delamination. *Id.* Any cracked/delaminated unit was scrapped. *Id.* ("SAT reveals areas of delamination as a 'white bump' . . . [a]ny unit with a 'white bump' was scrapped . . . [u]nits without 'white bump' were shipped.").

39.     NVIDIA also ran an industry standard Temperature Cycling B test (or "TCB" test) approved by the JEDEC Solid State Technology Association (formerly known as the Joint Electron Devices Engineering Counsel, or "JEDEC"). *See* Exh. 2 (HPNYGREN0004581) at ¶ 9 (discussing JEDEC TCB test cycle and results). JEDEC is an independent semiconductor engineering trade organization with hundreds of member organizations, including HP and NVIDIA Corporation.

40.     JEDEC's TCB test is a soldering bump stress analysis that cycles the chip from -55˚C through +125˚C approximately 200 times. Exh. 2 (HPNYGREN0004581) at ¶ 9 ("Temp Cycle: -55C/+125C (condition B), 200 cycles"). NVIDIA's TCB testing revealed no failures. Exh. 1 (HPNYGREN0003662) ("We completed moisture soak plus 200 cycles of TCB temp cycle on good parts from impacted lots with no failures. No failures occurred through 5x reflow.").

41.     Additionally, "to ensure that product that passes testing would not later fail," NVIDIA applied a heat stress far above product specification and produce no failures. Exh 1 (HPNYGREN0003662) at 2 ("we applied stresses to mimic device heat sink attachment to 150 psi (>50% of spec) with no failures").

42.     NVIDIA also altered its material set and manufacturing process to prevent recurrence of the pressure issue. The C-51 chips affected by the pressure issue were manufactured using a eutectic solder compound. On September 27, 2006, NVIDIA transitioned

Case No. 07-05793 (JW)                  8           DECLARATION OF RICHARD HUNT HODGE ISO
                                                    HP'S OPPOSITION TO PLAINTIFFS' MOTION FOR
                                                    CLASS CERTIFICATION

to high-lead solder material for the C-51 chip. High-lead is more malleable than eutectic and capable of absorbing more pressure from the chip during validation testing. *See* Exh. 1, (HPNYGREN0003661-3663).

43.     Additionally, on October 30, 2006, NVIDIA altered the component test socket to redistribute mechanical stress from the chip to the substrate and slowed the speed of the mechanical head applying force thereby reducing the likelihood of damage. *See* Exh. 1 (HPNYGREN0003663) ("Alter C51 FT Socket/Setup to reduce Mechanical Stress incurred to die . . . . Released new FT setup on 30 Oct 06").

44.     Only chips passing NVIDIA's quality control tests were cleared for shipment to HP and other computer manufacturers. The few that HP received prior to the aforementioned quality control testing mostly were discovered by Quanta Computer Inc., HP's original design manufacturer ("ODM") for Atlantis/Apollo, during manufacturing testing. The pressure crack issue, therefore, mostly resulted in yield loss – meaning most affected chips were detected at the factory and never shipped to consumers – as opposed to field loss.

45.     In September 2007, HP determined that, in some cases, a signal generated by the C-51 chip was insufficient to guarantee consistent communication with the notebook's wireless radio card thereby interrupting wireless functionality.

46.     By the end of September 2007, HP qualified a corrective BIOS update (BIOS version F.3A) which increased signal strength and resolved the wireless failures in 8 out of the 10 units captured from the field for evaluation. The design of BIOS version F.3A and decisions regarding its release occurred in Texas. The work to develop and code BIOS F.3A occurred in Taiwan.

47.     Signal strength is a software configurable setting, so BIOS version F.3A is a curative measure. A notebook experiencing wireless connectivity issues as a result of the signal strength issue will be fixed by BIOS version F.3A.

48.     In late October and early November 2007, HP, working with Quanta, captured and examined several thousand motherboards returned by customers because of a wireless failure; discovering "opens" between the substrate and die in the same locations found to have L1 solder

Case No. 07-05793 (JW)                    9          DECLARATION OF RICHARD HUNT HODGE ISO
                                                      HP'S OPPOSITION TO PLAINTIFFS' MOTION FOR
                                                      CLASS CERTIFICATION

1  cracks in previous samples. This capture and examination occurred in China. A cross-section

2  analysis of a sampling of similar "open" units revealed cracking at the L1 solder bump joint

3  between the die and substrate.

4  49. By November 5, 2007, HP concluded that these L1 cracks were the probable cause

5  of the wireless issue under investigation relating to Atlantis and Apollo notebooks.

6  50. By mid-November 2007, HP hypothesized that repeated temperature mini-cycling

7  could result in solder cracks at the L1 solder joint in some cases and believed eliminating that

8  temperature cycling would correct the issue.

9  51. As a result, by late-November 2007, HP developed another BIOS update (F.3D),

10  which modified the notebook's fan algorithm so that the fan runs continuously thereby

11  eliminating the problematic temperature cycling. The design of BIOS version F.3D and the

12  decisions relating to its release to customers took place in Texas and Taiwan.

13  52. The F.3D BIOS was released on or about December 3, 2007.

14  53. In January 2008, HP attempted to recreate chip cracks through a severe

15  temperature cycling test. Quanta, under HP's direction, modified 40 new discrete Atlantis boards

16  to create a very aggressive thermal cycling profile whereby the C-51 North Bridge would quickly

17  cycle between 27˚C and 87˚C. Under normal operating conditions, it is unlikely that the C-51

18  North Bridge inside an Atlantis or Apollo notebook would reach as high as 87˚C, which still is

19  well below the system maximum specification of 105˚C (case temperature of the NVIDIA part).

20  The temperature cycling testing occurred in China. I am familiar with this testing through my

21  communications with Quanta having helped define the test procedures and design modifications

22  and monitoring of the results.

23  54. Each notebook motherboard is equipped with a "heat sink," which contains a heat

24  pipe to quickly dissipate heat away from certain motherboard components, including the C-51, to

25  the notebook's radiator where it is cooled by the fan. A thermal pad is placed between the heat

26  sink and C-51 to draw the heat away from the chip. HP modified the heat dissipation

27  functionality by removing part of the thermal pad, thereby reducing its heat dissipation efficiency

28  by 50%. HP also modified the fan algorithm to create the test profile.

Case No. 07-05793 (JW)                    10       DECLARATION OF RICHARD HUNT HODGE ISO
                                                    HP'S OPPOSITION TO PLAINTIFFS' MOTION FOR
                                                    CLASS CERTIFICATION

55.     The test units were modified so that components on the motherboard would run at 87˚C for 10 minutes, cool to 27˚C within 15 minutes, and stand at 27˚C for 10 minutes.  HP ran this test against the 40 units continuously for 13 straight weeks.  The test did not induce a single failure chip crack.  Stated differently, after approximately 87,000 aggregate hours of aggressive thermal cycling testing, HP was unable to induce a single C51 failure.  For each test unit, the test simulated over 2,100 hours of use time without a failure.  This testing began in early January 2008 and was concluded in March 2008 and was conducted exclusively in China.

56.     Ultimately, by mid-2008, HP determined that operation of the NVIDIA part through a narrow temperature range – between 58˚C and 62˚C for UMA and between 62˚C and 67˚C for discrete – was the cause of wireless failures experienced by some customers.  The F.3D BIOS keeps the unit outside of this temperature range (usually around 50˚C at idle).  Because it runs constantly, it obviates the thermal mini-cycle through the problematic narrow temperature range discussed above and prevents the issue.

57.     Subsequent testing of the F.3D BIOS confirmed as much: (1) 25 modified Atlantis and Apollo notebooks were cycled from off to idle in 30 minute cycles; (2) the notebooks were allowed to remain at idle for 80% of the cycle and cooled to room temperature for the remaining 20% of the cycle; (3) after 20 of the units failed, the F.3D BIOS was applied to the remaining notebooks.  Continued operation at the aforementioned cycling pattern did not result in new failures, demonstrating that the F.3D BIOS would greatly reduce or eliminate the probability of future heat cycling chip cracks on units that had not already experienced such a crack.  The qualification of the F.3D BIOS occurred in Texas and in Taiwan.

58.     The F.3D BIOS does not degrade battery life or system performance.

59.     Post-launch evaluations were centered in Texas with the majority of post-launch testing occurring in either Texas or China.

60.     HP expanded the Limited Warranty Enhancement Program (the "Program") for Atlantis and Apollo units in November 2007.[1]  As HP learned more about the possible causes of

---

[1]      The Program first was launched in August of 2007 for an issue referred to internally as PQ1 (see ¶¶64-65).  The Program was expanded in November 2007 to include, among other symptoms, wireless failures.

Case No. 07-05793 (JW)                    11

wireless failures, the specific repairs made available under the Program also evolved. For instance, as of December 3, 2007, all Atlantis and Apollo replacement motherboards were pre-loaded with the F.3D BIOS. The replacement motherboards were manufactured in China.

61.     To ensure that the quality of spare motherboards (which are sometimes used for repairs) did not impact the quality of the Program repair, starting on December 7, 2007, Atlantis and Apollo replacement motherboards received a new C-51 chip even if no crack or other failure was detected in that motherboard's original chip. Each replacement motherboard likewise was preloaded with the F.3D BIOS. The combination of a new chip with the F.3D BIOS is an effective and reliable repair.

62.     Eutectic soldering and eutectic soldering paste react to temperature fluctuation in harmony and, therefore, eutectic based C-51 chips are not susceptible to the heat cycling issue that was identified in late October 2007. NVIDIA transitioned back to eutectic soldering bumps in or around July 2008. Starting October 23, 2008, discrete Atlantis and Apollo replacement motherboards were equipped with a eutectic C-51 chip rather than high-lead. UMA replacement boards were switched to eutectic C-51 by December 7, 2008.[2]

63.     The pressure issue, signal issue and heat cycling issue described above can manifest in the same manner; namely, the computer's device manager's inability to recognize the wireless device. In order to determine the root cause of that symptom, therefore, it is necessary to examine each computer. More specifically, to determine whether any such symptom resulted from heat-cycling issues, one must take a cross-section of each C-51 chip to determine, *inter alia*, whether the L1 soldering joint is cracked.

64.     Shortly after Atlantis and Apollo launched, my team began investigating captured field units exhibiting an inability to accept a charge from the AC adapter or to run when attempting to draw power from the AC adapter. This issue became known internally as PQ1, which refers to the field effect transistor found on a notebook's motherboard. PQ1 has no bearing

---

[2]     The changes may not have applied to a subset of Atlantis repairs between May 2009 and February 2010. Fewer than 1100 Atlantis units may have received a C-51 chip with "reflowed" soldering (meaning that the L1 solder joint was melted and reformed) and the F.3D BIOS.

on wireless functionality, however. In any event, HP implemented a design cut-in on September 26, 2006 that rectified the issue and, in August 2007, created a program providing a free motherboard repair to customers experiencing the PQ1 issue.

65. PQ1 was not caused by heat cycling stress and had no relationship to wireless capability.

66. I have reviewed the documents offered as Exhibits 14, 15, 16, and 17 to Mr. Ram's declaration in support of the plaintiffs' motion for class certification, and quoted on pages 5 and 6 of Plaintiffs' motion. From the dates and context of those documents and my personal experience with the issues referenced therein, I have determined that the subject of each of those documents is the PQ1 issue I described above and not any heat cycling issue affecting wireless connectivity. PQ1 issue resolution work occurred in and solutions were developed in Texas and Taiwan or China.

67. I have also reviewed the plaintiffs' argument regarding Quanta's agreement to indemnify HP for certain motherboard repairs. Again, these matters relate to PQ1 *and not* any heat cycling issue that could affect wireless connectivity. *See, e.g.*, Ram Decl. at Exhs. 18, 20, 21, 22; Motion at 6, lines 7-11.

68. I have also reviewed Exhibit 19 to Mr. Ram's Declaration and determined that the e-mail chain in that document from November 2006 relates to the issue I described above regarding NVIDIA's application of too much pressure on a small number of C-51 chips – not any heat cycling issue that could affect wireless connection. The dates of the communications in this document preclude any conclusion that it relates to any such heat-cycling or other wireless connection issue.

69. I have also reviewed Exhibits 30, 31, 32, 33, 34, and 35 to Mr. Ram's Declaration in support of the plaintiffs' motion for class certification. Mr. Roesch and his team are not members of HP's notebook computer group and did not participate in the design, manufacture, or validation of the Atlantis and Apollo notebook computers. Instead, Mr. Roesch's team is part of Global Engineering Services, and performed forensic failure analysis on certain parts, including parts not at issue in the litigation, of the Atlantis and Apollo models. Mr. Roesch's work was

1  performed at the direction of my team in Texas and under parameters developed by my team from
2  Texas.

3        70.    Annualized Rate of Return (or "ARR") takes a snapshot of system returns in any
4  given month and predicts return rates over a year should that trend continue.

5        71.    By way of explanation, Rate of Return is a component return rate metric that is
6  related to the component failure rate in the field on a particular notebook system. It is used to
7  track spare part demand for that component. It is different than the actual failure rate of the
8  component.

9        72.    In many situations the repair technician may be uncertain which component is at
10  fault. In some of these situations the technician will replace two or more components in an effort
11  to make certain the customer's unit is repaired. For example, if a hard drive is found to have
12  failed, the technician would replace the hard drive but, out of an abundance of caution, might also
13  replace another component (i.e., the motherboard) in case that other component contributed to
14  that failure. These components are then returned to a different location for test and repair.
15  Typically only one component is found to have failed and the other component that did not fail is
16  classified as "no fault found." Because both components were returned, however, each is counted
17  in the return rate.

18        73.    The Monthly Rate of Return is calculated by dividing the number of platform
19  components returned in that month by the total number of that platform's in-warranty units.
20  Annualized Rate of Return or (ARR) is calculated by multiplying the monthly return rate by 12 to
21  project the return rate for a year if the same rate were to occur during the next 11 months.

22        74.    In sum, ARR does not reflect actual, or even projected, Notebook failure rates.

23        75.    An Atlantis or Apollo motherboard replacement can be attributable to a number of
24  issues or causes unrelated to wireless failures and/or any heat cycling stress that could affect
25  wireless connectivity. Similarly, not all heat cycling stress will manifest as a wireless failure or
26  even produce a failure at all.

27
28

Case No. 07-05793 (JW)      14    DECLARATION OF RICHARD HUNT HODGE ISO HP'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    I declare under penalty of perjury under the laws of the United States of America and the

2    State of California that the foregoing is true and correct.  Executed on April 12, 2010, at Houston,

3    TX.

4

5    _____

     Richard Hunt Hodge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 07-05793 (JW)                    15        DECLARATION OF RICHARD HUNT HODGE ISO
                                                    HP'S OPPOSITION TO PLAINTIFFS' MOTION FOR
                                                    CLASS CERTIFICATION

1

**PROOF OF SERVICE**

2

    I, Kristofor T. Henning, hereby certify that on June 3, 2010, I caused the foregoing
document titled **DECLARATION OF RICHARD HUNT HODGE IN SUPPORT OF**

3

**HEWLETT-PACKARD COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**, previously filed under seal on April 13, 2010, to be electronically

4

filed and served upon the persons named below via the ECF system.  This document is available
for review and downloading from the ECF system.

5

6

MICHAEL F. RAM

7

mram@ramolson.com
RAM & OLSON LLP

8

555 Montgomery Street, Suite 820
San Francisco, CA 94111

9

Telephone: 415-433-4949
Facsimile:  415-433-7311

10

11

MARC H. EDELSON
medelson@edelson-law.com

12

EDELSON & ASSOCIATES, LLC
45 W. Court Street

13

Doylestown, PA 18901
Telephone:  215-230-8043

14

Facsimile:  215-230-8735

15

JEFFREY L. KODROFF

16

jkodroff@srkw-law.com
JOHN A. MACORETTA

17

jmacoretta@srkw-law.com
SPECTOR, ROSEMAN KODROFF & WILLIS, P.C.

18

1818 Market Street, Suite 2500

19

Philadelphia, PA 19103
Telephone: 215-496-0300

20

Facsimile:  215-496-6611

21

Attorneys for Plaintiffs

22

23

Dated:  June 3, 2010                 By:   /s/ Kristofor T. Henning   

24

Kristofor T. Henning

25

26

27

28